IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| CHRISTOPHER ALLEN ) | |
| 4613 S Maze Drive ) | |
| Muncie, IN 47302 ) | |
| ) | |
| AND ) | |
| ) | |
| NICOLE ALLEN ) | |
| 4613 S Maze Drive ) | |
| Muncie, IN 47302 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 1:20-cv-3269 |
| ) | |
| PPE CASINO RESORTS MARYLAND, LLC ) | |
| DBA Maryland Live! Casino. ) | |
| 7002 Arundel Mills Circle ) | |
| Hanover, MD 21076 ) | |
| ) | **JURY TRIAL DEMANDED** |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT

Plaintiffs Christopher Allen ("Mr. Allen") and Nicole Allen ("Mrs. Allen") (collectively "Plaintiffs"), by and through their attorney, David Baña, bring this action against Defendant PPE Casino Resorts Maryland, LLC – DBA Maryland Live! Casino ("Defendant" or "Casino" or "Company" or "Maryland Live!") to redress unlawful discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991, and in support thereof state as follows:

## NATURE OF THE ACTION

1.     Through this action, Plaintiffs seek injunctive relief, compensatory and punitive damages, back pay, front pay, interest on back pay, and reasonable attorney's fees and costs arising from the severe and pervasive sexual and racial harassment Mrs. Allen endured at the hands of the Company's VIP player and the subsequent termination from employment suffered by both Plaintiffs in retaliation for engaging in protected activity.

## PARTIES

2.     Plaintiff Christopher Allen (White) is an adult male who currently resides in Muncie, Indiana.

3.     Plaintiff Nicole Allen (White) is an adult female who currently resides in Muncie, Indiana.

4.     Mr. Allen and Mrs. Allen are husband and wife.

5.     Defendant PPE Casino Resorts Maryland, LLC is a limited liability company organized under the laws of the State of Maryland with its principal place of business located in Hanover, Maryland.

6.     PPE Casino Resorts Maryland, LLC operates the Maryland Live! Casino adjacent to Arundel Mills Mall.

7.     At all relevant times, PPE Casino Resorts Maryland, LLC has been an active Maryland LLC continuously doing business and has employed at least 15 employees in the State of Maryland.

8.     At all relevant times, PPE Casino Resorts Maryland, LLC has engaged in commerce both inside and outside of the State of Maryland.

2

9.     At all relevant times, Defendant has been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g), and (h).

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action is brought pursuant to Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

11.     Personal jurisdiction is proper because Defendant conducts business in the State of Maryland.   Venue is proper in this District because Plaintiffs worked for Defendant at a facility located in this District and because Defendant's principal place of business is located in this District.

## ADMINISTRATIVE PREREQUISITES

12.     Mr. Allen has satisfied all administrative prerequisites and fulfilled all conditions precedent to instituting an action pursuant to Title VII by timely filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission's ("EEOC") Baltimore Field Office regarding Defendant's unlawful retaliatory conduct on August 9, 2016.

13.     On September 6, 2019 Defendant submitted a "substantive response" in the form of a Position Statement to the EEOC responding to Mr. Allen's Charge.   The Position Statement was eight (8) pages long, very detailed, and contained no less than 19

exhibits.  Many of the exhibits were documents created contemporaneously with the events that gave rise to Mr. Allen's cause of action.

14.     While Defendant asserted that the EEOC's lack of alacrity was "unacceptable," never once in their Position Statement did Defendant assert that they had lost or destroyed documents or other evidence or that they have been unfairly prejudiced — or prejudiced at all for that matter — in any way whatsoever.

15.     The EEOC issued a Right To Sue Notice to Mr. Allen with a "Date Mailed" date of August 19, 2020.

16.     Mrs. Allen has satisfied all administrative prerequisites and fulfilled all conditions precedent to instituting an action pursuant to Title VII by timely filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission's ("EEOC") Baltimore Field Office regarding Defendant's unlawful discriminatory and retaliatory conduct on August 9, 2016.

17.     On October 9, 2019 Defendant again submitted a "substantive response" in the form of a Position Statement to the EEOC responding to Mrs. Allen's Charge. The Position Statement was twelve (12) pages long, very detailed, and contained no less than 26 exhibits.  Many of the exhibits were documents created contemporaneously with the events that gave rise to Mrs. Allen's cause of action.

18.      Again, Defendant asserted that the EEOC's lack of alacrity was "unacceptable," but never once in their Position Statement did Defendant assert that they had lost or destroyed documents or other evidence or that they have been unfairly prejudiced — or prejudiced at all for that matter — in any way whatsoever.

19.     The EEOC issued a Right to Sue Notice to Mrs. Allen with a "Date Mailed" date of August 19, 2020.

## STATEMENT OF CLAIMS

### Factual Background

20.     Defendant Maryland Live! operates one of the largest commercial casinos in the United States. The Company employs a large and diverse workforce of over 2,800 employees.

21.     Defendant Maryland Live! also has a handbook that includes a workplace harassment policy, an anti-retaliation policy, a sexual harassment policy, an anti-bulling policy and a complaint procedure for employees to utilize if they feel they are being harassed.  The handbook also outlines how and when an investigation will be conducted and by whom.

22.     The workplace harassment policy states that, "Discrimination or harassment of a Maryland Live! Casino Team Member, whether by another Team Member, **_customer_**, supplier, vendor, or other individuals present in the work environment, will not be tolerated."  (emphasis added).

23.     Defendant's anti-retaliation policy "strictly prohibits any form of retaliation against any Team Member or applicant who has made a good faith complaint as to an incident of harassment . . ." The anti-retaliation policy explicitly protects those who cooperate with an investigation of a complaint.

24.     Defendant's sexual harassment policy permits Team Members to address harassment directly with the harasser and, if unsuccessful, Team Members are then

required to report the conduct to their supervisor or Defendant's Human Resources Department ("HR"). The policy further states that, "All complaints of sexual harassment will be promptly, thoroughly, impartially, and discreetly investigated by appropriate management personnel or outside counsel."

25.     Finally, the complaint procedure states, "If any Team Member is subjected to, has witnessed or has become aware of any harassment in violation of any of these Policies, that Team Member must notify his or her direct Supervisor immediately. _All Supervisors and Managers are required to immediately report all complaints that come to their attention under this policy to the Human Resources Department._ All internal investigations are to be administered by either the Human Resources or Surveillance Department."  (emphasis original).

26.     In practice, Defendant does not apply the various anti-harassment policies to the Casino's customers i.e. gamblers, or "players." For example, during shift meetings, Management would consistently address reported incidents of harassment from customers — including threats of violence against Casino staff — by telling the staff that "players get what they want," "just put a note in the player's file," "you know how these people (players) can be," and ". . . that's part of the job!"

27.     Plaintiff, Mr. Christopher Allen, began employment with the Casino in April 2013 as a Dual Rate Supervisor.  In December 2013 he was promoted to the position of Table Games Floor Supervisor. In that role, Mr. Allen was responsible for the successful operation of the table games area ensuring integrity of the games, safeguarding

company assets, and ensuring that guests have a favorable gaming experience.  Mr. Allen has over 13 years of experience in the casino industry.

28.     Mr. Allen dutifully performed his job duties in this role and consistently received positive feedback from management.

29.     Plaintiff, Mrs. Nicole Allen, began employment with the Casino in April 2013 as a Table Games Floor Supervisor.  Before the Casino opened to the public, Mrs. Allen was promoted to Dual Rate Pit Manager.   Mrs. Allen has over 26 years of experience in the casino industry.

30.     Although her title was one of "Manager," Mrs. Allen was still paid an hourly rate and she was not considered part of "Management." In this role, she was responsible for overseeing the smooth operation of the Casino's table games during her shift. Mrs. Allen supervised and evaluated the performance of the Floor Supervisors, Dealers, and Dual Rate Dealers. She also ensured that Dealers followed correct procedures for table games.  Mrs. Allen was responsible for responding to disputes between gamblers and dealers.  Mrs. Allen's position was fast paced, hectic, provided little down time, and was challenging and exhausting by any reasonable standard.

31.     Mrs. Allen dutifully performed her job duties in this role and consistently received positive feedback from management.

32.     At all relevant times, Patrick Brewster ("Mr. Brewster") was Defendant's daytime Shift Manager and one of Plaintiffs' direct supervisors.  Mr. Brewster had the authority to hire, fire, promote, demote, or change rate of pay of anyone at both Mr. and Mrs. Allen's level.  He also had the ability to eject or ban customers from the Casino.

7

33.     At all relevant times, Chong "Suk-E" Yeager ("Ms. Yeager") was Defendant's daytime Assistant Shift Manager and was also one of Plaintiffs' direct supervisors.  Ms. Yeager also had the authority to hire, fire, promote, demote, or change rate of pay of anyone at both Mr. and Mrs. Allen's level.  She also had the ability to eject or ban customers from the Casino.

34.     P.M. (a pseudonym used for purposes of this Complaint) (also "Harasser") was a customer of the Casino and a notorious cheater known to the Casino's Surveillance Department ("Surveillance") and roulette dealers.  Ironically, P.M. was also a member of the Casino's top tier VIP customers, known as a "Chairman Player."

35.     P.M. is a Black male.

### Mrs. Allen is Sexually and Racially Harassed and Suffers a Hostile Work Environment at the Hands of P.M.

36.     On or about August 2015, P.M. was playing roulette and claimed to have placed a bet that he did not actually place.  Mrs. Allen was called over to the table to resolve the dispute between P.M. and the dealer.  In doing so, she called the Surveillance team to review the footage of the bet and make a determination.  The Surveillance team reported back to Mrs. Allen that the player did not place the bet he was claiming.  Mrs. Allen reported the Surveillance team's findings to P.M. and informed him that the dealer was not going to pay him for a bet he did not place.  P.M. then told her, "you are the only one who calls Surveillance, everyone else just gives me the money."

37.     Mrs. Allen reported this incident to her Manager Suk-E Yeager, but Ms. Yeager dismissed her complaint.

38.     Later that month, Mrs. Allen was called to another incident involving P.M. and a dispute with a dealer over a bet.  When Mrs. Allen approached the table, P.M. said, "Oh no, not this bitch again…"

39.     Mrs. Allen called Surveillance to check on the legitimacy of P.M.'s claim of a "straight up" bet on the roulette table.  Surveillance reported back to Mrs. Allen that the bet that P.M. made was not a "straight up" bet as he claimed, but rather a "split" (which pays much less).  Mrs. Allen informed P.M. of the Surveillance Department's findings and informed him that the Casino was not going to pay him the "straight up" amount.

40.     P.M. then moved to a different pit in the Casino.  Mrs. Allen informed the Floor Supervisor in that pit — who happened to be Mr. Allen — that P.M. had just claimed a "straight up" bet and that Surveillance confirmed a "split" bet moments earlier in another pit.

41.     P.M. noticed the exchange between Mr. and Mrs. Allen and after Mrs. Allen left, he asked Mr. Allen, "what did she want?"  Mr. Allen replied, "nothing, she was just giving me your player number."  P.M. then tells Mr. Allen that Mrs. Allen is a "bitch." Mr. Allen informs P.M. that Mrs. Allen is his wife.  P.M. responds, "well not for nothing but your wife is a bitch."  Mr. Allen walked away and informed the Pit Boss of his interaction with P.M.

42.     Following this incident, at the next shift meeting, Mrs. Allen  reported to both Mr. Brewster and Ms. Yeager that P.M. was attempting to cheat on a regular basis

(cheating is known as "taking shots" in Casino vernacular) and that he referred to her as a "bitch."

43.     Mr. Brewster responded by telling Mrs. Allen to, "put a note in the player's file."

44.     In September of 2015, a floor person called Mrs. Allen to a roulette table to resolve a dispute between the dealer and P.M.  By now, the story was the same.  P.M. had claimed that he was entitled to a larger payout because he placed his bet "straight up" and the dealer recorded P.M.'s bet as a "split."   Mrs. Allen called Surveillance and Surveillance reported back to her that P.M.'s bet was a "split" — not "straight up" as P.M. had claimed.

45.     Mrs. Allen reported the Surveillance team's findings to P.M. and he was enraged.  He raised his voice and began yelling at Mrs. Allen.  Screaming, he said, "You are such a bitch! You never give me the benefit of the doubt!"  Mrs. Allen calmly replied that the Surveillance team reviewed the camera footage and the footage showed a "spilt" bet.

46.     Immediately after the incident, Mrs. Allen called the Manager's office to report both the cheating and the sexual harassment.  Ms. Yeager picked up the phone and Mrs. Allen told Ms. Yeager what had happened and that P.M. called her a "bitch."  Ms. Yeager told Ms. Allen that she would come "right up."

47.     After sometime, Ms. Yeager finally made it to the Casino floor and claimed to look for P.M. but reported back to Mrs. Allen that she could not find him.

48.     At that point, Mrs. Allen called Surveillance and asked them to take a still image of P.M. and to forward that image to Mr. Brewster and Ms. Yeager.  Surveillance confirmed to Mrs. Allen that they had done so.

49.     Sometime on or about October of 2015, P.M. got into yet another dispute with a dealer at the roulette table.  P.M. again claimed that he had placed a bet "straight up" and the dealer recorded the bet as a "split."

50.     Mrs. Allen was summoned to this roulette table to resolve the dispute.

51.     Upon seeing Mrs. Allen, P.M. yelled loudly and emphatically, "Oh, hell no! Not this bitch again!" and "She never lets me win because she is a racist and a white supremacist!"

52.     Mrs. Allen simply called Surveillance and told them that she needed them to review the video and report their findings as to P.M.'s last bet.  Surveillance reported back to Mrs. Allen that P.M.'s last bet was a "split."  Mrs. Allen informed P.M. that the Casino was not going to pay P.M. the "straight up" payout.  P.M. responded and said loudly, "I knew you weren't going to pay me! It's because you're white."  P.M. then pointed to the cameras and said, "I bet everyone up there is white too."  P.M. yelled these statements so loudly that patrons and and other Casino employees began staring at Mrs. Allen.

53.     Mrs. Allen walked away to immediately call to see if she could get a hold of Mr. Brewster or Ms. Yeager to report P.M.'s cheating attempt and his harassing behavior.  Mrs. Allen was able to get a hold of both Mr. Brewster and Ms. Yeager and

they both assured Mrs. Allen that they will come to the Casino floor immediately to confront and speak with P.M.

54.     At that moment, Mrs. Allen felt assured that P.M.'s conduct was going to be promptly and appropriately addressed by Management.   However, that feeling of assurance was short lived as it took Mr. Brewster and Ms. Yeager over 30 minutes to come to the Casino floor.   At that point, P.M. was nowhere to be found.

55.     Later that month, Mrs. Allen was again called to a roulette table to resolve a dispute between a new Pit Boss that Mrs. Allen had been training, and P.M.   As Mrs. Allen approached the roulette table, P.M. rolled his eyes and said, "not this bitch again!"

56.     Mrs. Allen conferred with the Pit Boss trainee and confirmed that P.M. had claimed a "straight up" bet and the dealer had recorded a "split."   Both the Pit Boss trainee and Mrs. Allen informed P.M. that they are calling Surveillance and will report their findings to him.

57.     Surveillance reported back that P.M.'s bet was a "split" bet, not a "straight up."   The Pit Boss trainee informed P.M. of the Surveillance team's findings.   P.M. responded by pointing to Mrs. Allen and asking the Pit Boss trainee, "Did she say it? She won't give me the bet because she is white and she's a racist."

58.     Mrs. Allen asked the Pit Boss trainee to report P.M.'s attempted cheating and his remarks to Mr. Brewster and to Ms. Yeager.   Mrs. Allen witnessed her calling the Manager's office and reporting the entire incident.

59.    Sometime in early December 2015, Mrs. Allen was yet again called to a roulette table to resolve a dispute over a bet between P.M. and a dealer.  Again, P.M. claimed to had made a "straight up" bet and the dealer recorded a "split" bet.

60.    Mrs. Allen called Surveillance for a determination on P.M.'s claim.  While awaiting for a call back from the Surveillance team, P.M. berated Mrs. Allen and said, among other things, "Fuck this! You're not going to give it to me because I'm black and you're a racist bitch."

61.    Surveillance confirmed that the dealer was correct and that the bet was a "split" and not a "straight up."  Mrs. Allen informed P.M. of the Surveillance team's findings and walked away.

62.    Mrs. Allen then called the Manager's office, and, after sometime, finally reached Mr. Brewster.  She told Mr. Brewster about P.M.'s latest cheating attempt and about him calling her a bitch and a racist.  Mr. Brewster informed Mrs. Allen that he will be "right up" to confront P.M. and speak with him about his conduct.  Mr. Brewster never came and P.M. left the Casino.

63.    Mrs. Allen was genuinely hurt and found P.M.'s conduct offensive.  She was particularly bothered by P.M.'s assertions that she was making race based decisions with respect to his claims of "straight up" bets.

64.    The very next day, during a pre-shift meeting — attended by Mr. Brewster, Ms. Yeager, Mrs. Allen, and some of the Casino's Pit Bosses — Mrs. Allen asked Mr. Brewster, "What are we doing about P.M.?"  She went on to say that P.M. is constantly "taking shots" (cheating) and harassing her and other employees.

65.    Mr. Brewster responded by saying, "well its nothing you haven't heard before," and laughed.   Mr. Brewster went on to say that if it happens again, "just call me!"

66.    Mrs. Allen replied by telling Mr. Brewster that she had been calling him.

67.    At that point, Mr. Brewster asked Mrs. Allen to "hang back" after the meeting.

68.    After the meeting, Mrs. Allen, Mr. Brewster, and Ms. Yeager met and discussed the situation regarding P.M.

69.    Mrs. Allen re-iterated that P.M.'s conduct was harassing and that he was constantly cheating.

70.    Mr. Brewster told Mrs. Allen that it was up to Management's sole discretion on how to handle a player like P.M.   He went on to tell Mrs. Allen that ". . . you know how these people (players) are. . ." and that dealing with conduct like P.M.'s "was part of the job."   Mrs. Allen pushed back and told Mr. Brewster and Ms. Yeager that in all of her years in the Casino business, she never had to deal with constant cheating attempts and harassing behavior like P.M.'s.   She acknowledged that she had certainly encountered rude and demanding customers in the past, but those instances were few and far between.   She reiterated that she had never witnessed such consistent cheating and suffered through such constant harassment from a single player like she did with P.M.

71.    Overall Mr. Brewster's and Ms. Yeager's attitude toward the cheating and the harassment was very lax.

14

72.     Mr. Brewster and Ms. Yeager reiterated that Mrs. Allen was free to put notes in P.M.'s file in the "Pit Boss" computer program — the computer program that the Casino utilized to, among other things, track players on the Casino floor.

73.      On or about January 15, 2016 Mrs. Allen was yet again called to a roulette table to resolve a dispute between a dealer and P.M.  This time, P.M. claimed that the dealer took his bets off the table and "threw" his chips back at him and that he had won a "straight up" bet.

74.     The dealer told Mrs. Allen that he was waiving his arm and announcing "no more bets" when P.M. grabbed his arm and started placing bets.

75.     At that point, Mrs. Allen called Surveillance for a determination on P.M.'s claim.

76.     While waiting for the Surveillance team to call back with its findings, P.M. told Mrs. Allen that she should just pay him because he is a "Chairman" player and that if his skin color were different —meaning if P.M. was white — she would have already paid him for the "straight up" bet.

77.     The Surveillance team called back and confirmed what the dealer had told Mrs. Allen.  Specifically, that the dealer had called off bets, that P.M. grabbed the dealer's arm, and that P.M. did not win the "straight up" bet or any bet for that matter. Surveillance went on to say that P.M.'s chips were no where near the number that hit.

78.     Mrs. Allen reported to P.M. the Surveillance team's findings that he did not win the "straight up" bet as he claimed or any bet at all.   P.M. then went on a rant about how white people lie and that the Surveillance team is probably white and racist too.  He

then went on to call Mrs. Allen and other Casino employees "racist mother fuckers" and left.  Mrs. Allen did not hear P.M. call her a "racist mother fucker."

79.     After this incident, Mrs. Allen called the management office to report what happened, but no one picked up.   She also texted her manager, Ms. Yeager, (Mr. Brewster was off that day) and reported that P.M. attempted to cheat and that he was "out of control" and that his behavior "needs to be addressed."   Ms. Yeager never responded or otherwise assisted Mrs. Allen.   At that point it became clear to Mrs. Allen that Management was not interested in correcting the hostile work environment, that they were ignoring her cries for help, and that they viewed the racial and sexual harassment "as part of the job!"

80.     Later that evening, Mrs. Allen was assisting a Pit Manager when P.M. went to sit down at a roulette table in the pit.  As he sat down, P.M. started menacingly staring at Mrs. Allen.  Mrs. Allen asked P.M. if he was OK and he replied that he was staring at someone behind her.   P.M. then said loudly — making a scene — "I know what your problem is Nicole, you're a racist.  Yeah! You're a fucking racist."  P.M. then went on to grab the attention of black patrons and started pointing at Mrs. Allen yelling, "look at this racist bitch, she is the head of the KKK, this stupid white bitch, she's so fucking dumb." This went on for some time.  Then, P.M. went on to say, "I am a 'Chairman,' you will regret this you fucking white supremacist."   He continued and said, "I'm going to go above you, I'm going to get your job!"

81.     Mrs. Allen told P.M. that she was offended by his comments because she is not a racist at all.   In addressing P.M.'s racial harassment and his charge that she is a

"white supremacist," Mrs. Allen explained that by virtue of his raced based statements towards her that he was actually the racist.

82.    Mrs. Allen then called the "Pencil," a type of supervisor who works alongside Management in the Shift Manager's office to find out who the Shift Manager on duty was.   The Pencil responded and told her that Todd VanHettinga ("Mr. VanHettinga") was the Manager.

83.    Mrs. Allen then asked for Mr. VanHettinga to come assist her with P.M. and he promptly came and approached P.M.

84.    Concerned that Ms. Yeager was unresponsive to her texts and calls and that P.M. had put hands on a dealer, Mrs. Allen thought it prudent to write a statement memorializing her altercations with P.M.  Mrs. Allen's statement included the detailed back and forth where she told P.M. that his baseless claims of racism actually made him a racist.

85.    The statement Mrs. Allen wrote is known as a "table games incident report."  On the bottom of the report, there is a signature line for "Management" and another line for "Employee."   Mrs. Allen signed on the signature line next to "Employee."   Although Mrs. Allen submitted the table games incident report to Management, and the Casino submitted the report to the EEOC as an exhibit in their position statement, Management refused to sign or otherwise acknowledge the incident report because, if they did, there would be a written record of their knowledge of P.M.'s harassment of Mrs. Allen.  As demonstrated in their course of conduct, Management preferred to ignore Mrs. Allen's cries for help and written pleas because they knew that

P.M's conduct was unlawful and they further knew that they had a legal obligation to protect Mrs. Allen.  An obligation they obviously did not want to undertake.

86.     In the following days, Mr. Brewster and Ms. Yeager sat down with Mrs. Allen and she told them about the incidents that occurred on January 15 with P.M. and further recounted all of his past cheating and harassing conduct.  Mr. Brewster was aware of Mrs. Allen's table games incident report, they discussed it, and he told Mrs. Allen not to worry and that her job was safe.

87.     When Mrs. Allen pressed Mr. Brewster about how he was going to handle P.M. he responded, "If you see him, just call me so that I can talk to him."

88.     The Casino did not immediately investigate the January 15 incident.

89.     On or about January 29, 2016, Mrs. Allen saw P.M. go to a high limit black jack table.  She immediately called the Shift Manager's office looking for Mr. Brewster or Ms. Yeager but there was no answer.  She then asked the Pit Boss if he had seen Mr. Brewster and he replied that he had not.  She asked the Pit Boss if he could try to get a hold of Mr. Brewster on his cell phone and he said he would.  She then proceeded to call every phone line in the shift manager's office but no one answered.

90.     After P.M. left the blackjack table, Mrs. Allen went and spoke to the dealer. The dealer reported to Mrs. Allen that P.M. was ranting about how he was going to get Mrs. Allen fired from the Casino and that he had already filed a complaint against her and that he had already spoken to upper management about her and that she and other Casino staff members were racist.

91.     Mrs. Allen asked the dealer if she would be willing to write a statement about what P.M. had told her and the dealer agreed.  Mrs. Allen took the statement and gave it to the Pencil and asked the Pencil to give it to Mr. Brewster and the Pencil agreed.

92.     Later that day, when Mrs. Allen was on a work break, she found Ms. Yeager in a different part of the Casino and told her what happened with P.M.

93.     The next day, at a pre-shift meeting — attended by Mr. Brewster, Ms. Yeager, Mrs. Allen, and some of the Casino's Pit Bosses — Mrs. Allen brought up the incident with P.M. and explained that P.M. is going around telling folks that she is racist and that he is going to get her fired and that dealers who do not pay him out for "straight up" bets are racist too.   Mr. Brewster told Mrs. Allen not to worry about P.M.'s statements because everyone knows that she is not a racist.  He then asked her to "hang back" after the meeting.

94.     After the meeting, Mrs. Allen, Mr. Brewster, and Ms. Yeager met.  Mr. Brewster asked Mrs. Allen why she had not called him when she saw P.M.  Mrs. Allen explained that she did in fact call for both him and Ms. Yeager but no one answered the phone.  She went on to say that she later found Ms. Yeager during her break and reported what happened to her.  Mr. Brewster began yelling at and berating Ms. Yeager for not notifying him as soon as she heard from Mrs. Allen.

95.     A few days later, Mrs. Allen was yet again called to a roulette table to resolve a dispute between a dealer and a player.  As she approached, she saw that the player was P.M.  P.M. was again claiming that he placed a "straight up" bet.  Mrs. Allen called Surveillance and the Surveillance team found that P.M. placed a "split" bet, not a

"straight up" bet as he claimed.  Mrs. Allen informed P.M. of the Surveillance team's findings.

96.     P.M. began to yell at Mrs. Allen and called her a "racist" and a "cunt" and told her that he is going to get her fired.

97.     Mrs. Allen walked away and called Ms. Yeager.  Ms. Yeager answered the call and Mrs. Allen told her about the interaction that just transpired with P.M.

98.     Ms. Yeager instructed Mrs. Allen to move to another pit.  Mrs. Allen did as instructed.

99.     On or about February 6, 2016, Mrs. Allen was helping a new floor person at a roulette table when P.M. suddenly approached and began playing.  Mrs. Allen walked to the pit phone and began calling for Mr. Brewster and Ms. Yeager.  Neither of them answered.  While telephoning for Management, Mrs. Allen overheard P.M. tell the new floor person — who is a black male — that he needs to watch his back around Mrs. Allen because she is a "racist" and a "white supremacist."

100.    Mrs. Allen was then called to a different pit to handle an issue and left the pit where P.M. was playing roulette.

101.    On her way to the other pit, she was looking for either Mr. Brewster or Ms. Yeager but they were nowhere to be found.

102.    About 5 mins later, Mrs. Allen was called back to the roulette table where P.M. was playing to resolve a dispute over a bet that P.M. had placed.  P.M. was claiming that he had placed a "straight up" bet and the dealer recorded a "split" bet.

103.    Mrs. Allen then called the Surveillance team to review P.M.'s bet and the Surveillance team reported that P.M.'s last bet was a "split."  Mrs. Allen informed P.M. of the Surveillance team's findings.

104.    At that point, P.M. called Mrs. Allen "the head of the KKK" and told her that if he was white, she would just believe him and just pay him out for a "straight up" bet.  P.M. then went on to grab the attention of other black patrons of the Casino — as he had done before — and he pointed to Mrs. Allen and yelled, "she is the head of the KKK."

105.    Mrs. Allen walked away and began attending to other matters that needed her attention on the Casino floor.  Throughout the rest of her shift, she kept an eye out for Mr. Brewster and Ms. Yeager but did not find them.

**Mr. Brewster Conducts a Sham Investigation into Mrs. Allen**

106.    At the end of her shift, Mrs. Allen sent a text to Mr. Brewster and Ms. Yeager informing them that she feels it necessary to escalate her complaints of a "hostile work environment" to the Human Resources Department because of P.M.'s constant and unbearable harassment of her.  In her text, Mrs. Allen references statements that she had collected from her co-workers and given to the Pencil to file.  Mr. Brewster simply responded, "you were supposed to call me."

107.    Instead of notifying the Human Resources Department of Mrs. Allen's complaints — as the handbook requires — Mr. Brewster, on the very next day, February 7, 2016, started to "paper the file" by writing self-serving signed statements to counter

balance the statements Mrs. Allen collected from her co-workers on January 29th and February 6th (the previous day).

108.    In his self-serving statements, Mr. Brewster perpetuates a false narrative that Mrs. Allen was insubordinate because she failed to call or notify him of P.M.'s presence in the Casino.

109.    The day after that, February 8, 2016, Mr. Brewster got a Supervisor to write a one-sided "table games incident report" of an interaction Mrs. Allen had with P.M. twenty-four (24) days earlier.

110.    The statement from the Supervisor formed the Casino's basis for Mrs. Allen's termination in the coming days.  The Casino took the position that Mrs. Allen's conduct described in the Supervisor's table games incident report constituted "a complete disregard of the Company's customer service standards" and was egregious enough to warrant termination.

111.    Unlike Mrs. Allen's table games incident report, the Supervisor's table games incident report was signed by both Mr. Brewster and the Supervisor.   Mr. Brewster signed on the line for "Management" and the Supervisor signed on the line labeled "Employee."

112.    No one from the casino ever communicated to Mrs. Allen why the supervisor failed to report such a "complete disregard of the Company's customer service standards" that warranted termination for twenty-four (24) days.

113.    Two days later, on February 10, 2016 Mr. Brewster got another employee to write a one-sided table games incident report of the same interaction Mrs. Allen had with P.M.  But now, it was twenty-six (26) days after the fact.

114.    This statement substantially mirrors the statement submitted two (2) days earlier by the Supervisor.

115.    This statement also formed the Casino's basis for Mrs. Allen's termination in the coming days.  The Casino took the position that Mrs. Allen's conduct described in this statement from the employee's table games incident report constituted "a complete disregard of the Company's customer service standards" and was egregious enough to warrant termination.

116.     This table games incident report was also signed by Mr. Brewster on the line for "Management."  The employee signed on the line labeled "Employee."

117.    The Casino did not discipline in anyway whatsoever either the Supervisor or the employee for their failure to immediately report such egregious conduct that constituted "a complete disregard of the Company's customer service standards" that warranted the termination of Mrs. Allen.

### Mrs. Allen's Employment with the Casino is Terminated

118.    On or about Sunday, February 14, 2016, Mrs. Allen, while working her shift, saw P.M. and immediately called for Mr. Brewster.  Mr. Brewster answered the call and told her he will be right up and hung up the phone.  He then quickly texted Mrs. Allen and told her to switch pits with another employee.  Mrs. Allen did as instructed.  To

Mrs. Allen's knowledge, Mr. Brewster never came up to the Casino floor to confront P.M. or otherwise address his harassing behavior.

119.    Mrs. Allen was off for the next few days and when she got back to work on Wednesday February 17, 2020 she was called into the Casino's Human Resources ("HR") office two (2) hours into her shift.  There, she was told by Human Resources Business Partner Ms. Laura Liquornik ("Ms. Liquornik") that she was being suspended without pay, pending an investigation.

120.    Two days later, on February 19, 2016 Ms. Liquornik called Mrs. Allen to the Casino's HR office.  There she told her that as a result of her investigation, she was being terminated for "an aggressive confrontation with a Chairman player [P.M.] that included profane language. . ." (full name in original) and that constituted a complete disregard of the Company's customer service standards and was egregious enough to warrant termination.  Ms. Liquornik further informed Mrs. Allen that she was also being terminated for insubordination for failing to contact her managers when her harasser, P.M. was in the building.

121.    Ms. Allen pushed back — flat out denied all those allegations — and asked Ms. Liquornik "what investigation?"  Mrs. Allen pushed on and stated, "You didn't bother to ask me a single question."  Ms. Allen reiterated that she did not use profane language toward P.M. and that P.M. had regularly used profane language toward her and that management had failed to address her concerns of harassment.  Ms. Liquornik acknowledged that she did not bother to ask Mrs. Allen a single question as part of her investigation.

122.   Ms. Liquornik did not actually conduct an investigation into Mrs. Allen or her claims of harassment by P.M. in anyway and failed to write up any sort of report or findings other than the termination paperwork.

123.   Mrs. Allen was then escorted from the building.

**Mr. Allen Opposes Mrs. Allen's Discriminatory and Unlawful Suspension and Termination**

124.   In the days between Mrs. Allen's suspension and termination, Mr. Allen met with Ms. Liquornik to oppose Mrs. Allen's suspension.

125.   Specifically, Mr. Allen complained that P.M. should have been banned from the Casino long ago not only for his constant cheating but for his prolonged, unaddressed, and continued harassment of Mr. Allen's wife, Mrs. Allen.

126.   He reiterated that Mrs. Allen was the victim of sexual and racial harassment at the hands of P.M. and told Ms. Liquornik about Management's repeated failures to keep her safe.

127.   Ms. Liquornik dismissed Mr. Allen's complaints and told him that it was not her "place" to investigate or otherwise look into P.M.'s conduct because he was a customer and not an employee.

128.   At a pre-shift meeting — attended by Mr. Allen, Mr. Brewster and other Casino employees — Mr. Allen asked Mr. Brewster to clarify the proper protocol for reporting harassment by a customer.

129.    Mr. Brewster berated Mr. Allen — in front of his co-workers — for asking such a question.   On top of that, Mr. Brewster refused to answer the question.   Mr. Brewster then told Mr. Allen to come to his office after the meeting.

130.    In his office, Mr. Brewster told Mr. Allen that he cannot have him "starting a riot" at work and that he expects Mr. Allen "to be professional" while at work.   Mr. Brewster elaborated and told Mr. Allen that "being professional" meant that he had to keep quiet and could not oppose, react, or otherwise protest his wife's termination.   He referred to Mrs. Allen's termination as "the recent event involving Nikki," he specifically stated that "due to recent events, I can't have you react or complain about what happened, you can't be emotional, you have to be professional."   Mr. Brewster made it clear that he did not want to hear about Mr. Allen discussing the circumstances surrounding his wife's termination with other employees.   Mr. Brewster went on to instruct Mr. Allen that he is not to talk to other employees "about the recent events involving Nikki."   Mr. Brewster further made it clear that Mr. Allen would be disciplined if he continued to oppose or "bring up" his wife's termination.

131.    Mr. Brewster also instructed Mr. Allen that he was not to get into an argument with P.M. and that if P.M. began harassing him, that Mr. Allen was to call Mr. Brewster or Ms. Yeager.

132.    On or about March 24, 2016 Mr. Allen was supervising the Casino floor when he noticed P.M. at a roulette table place a "split" bet and, as one of the numbers in the "split" hit, P.M. claimed that the bet was a "straight up" bet and sought a 35 to 1 payout.

133.    Mr. Allen, in an effort to protect Casino assets, intervened and informed P.M. that he saw him place the bet as a "split."

134.    P.M. became irate and began yelling at Mr. Allen saying, "Go get Pat! Get Pat's ass out here. Pat will pay me! Get his ass out here!"

135.    Mr. Allen calmly informed P.M. that Mr. Brewster was not currently in the Casino because he had left for the day and — ever mindful of his instructions not to argue with P.M. — he turned around to call his Pit Boss on the phone to come deal with P.M.  P.M. then started yelling, "that's right, call your boss, get someone else out here, I'm not dealing with your stupid ass!"

136.    P.M. then went on to scream something to Mr. Allen about Mrs. Allen's termination.  Mr. Allen, in an effort to gather information and evidence in support of his wife's EEO claim — directly from her harasser — turned around and asked P.M. if he could repeat what he had just said about his wife's termination.

137.    P.M. yelled at the top of his lungs, "That's how I took your wife's job, and I'll take your job too."  At that point, fearing that P.M. had the potential for violence, Mr. Allen motioned for a nearby security guard to come and take control of the situation.

138.    After the security guard arrived, the Pit Boss came, and then 4-5 other security guards arrived and P.M. appeared to have calmed down.

139.    After some time passed, P.M. — in talking to the security guards — bragged to them that he wanted to "put his hands on" Mr. Allen and that if he did, he would end up in "real trouble."

27

140.     Then, Mr. Allen was escorted to the Shift Manager's office and after about 45 minuets, shift manager Johnny Petrovitch ("Mr. Petrovitch") came in to speak with Mr. Allen.

141.     Mr. Petrovitch told Mr. Allen that he was watching the video of the entire incident and informed Mr. Allen that he had handled the situation correctly up to a point. He told Mr. Allen that he saw him turn away from P.M. and call for the Pit Boss but that at some point he reengaged P.M. and that was wrong of him.

142.     Mr. Allen stated that he reengaged P.M. because he had said something about his wife's termination.  Mr. Petrovitch told Mr. Allen, "you can't go back at him, I've got to suspend you pending investigation."  Mr. Allen was suspended and sent home.

143.     Approximately six days later, Mr. Allen's employment with the Casino was terminated by Ms. Liqournik for being "argumentative" and "hostile" toward P.M.

144.      The Casino did not investigate the interaction between Mr. Allen and P.M. in anyway and failed to write up any sort of report or findings other than the termination paperwork.  While on suspension pending investigation, the Casino never interviewed Mr. Allen or otherwise asked him a single question relating to the interaction with P.M.

145.     After Mr. Allen's termination, Mr. Brewster told Casino employees during a pre-shift meeting that the Allen's were suing the Casino.

**Management Had the Ability to Locate P.M. in the Casino the Entire Time**

146.     The Casino's computer system has sophisticated player tracking and management software that allows management and/or security to see where a player is

playing in real time or when a player cashes in or out.  They also have the ability to put a

pop up on the screen whenever a player swipes in or cashes in or out.  That pop up can

alert a dealer or cashier to call management or security.

## COUNT I
## DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e *et seq*.

147.   Plaintiffs reallege and incorporate by reference each and every allegation

contained in each and every aforementioned paragraph as though fully set forth herein.

148.   Plaintiff Mrs. Allen suffered sexual and racial harassment at the hands of

Defendant's customer/gambler in the form of a hostile work environment.   The

Harasser's conduct was severe in that he used derogatory and pejorative language

regularly in the course of conducting business.  The Harasser repeatedly referred to Mrs.

Allen as a "bitch," a "cunt," a "white supremacist," "the head of the KKK," a "racist," a

"racist bitch," a "racist mother fucker," and a "stupid white bitch."

149.   The Harasser's conduct was pervasive.   The Harasser persistently and

consistently engaged in a highly offensive, unwelcomed speech and conduct either

directed at Mrs. Allen or in the presence of Mrs. Allen for approximately six (6) months.

150.   At all times, the Harasser's speech and conduct was unwelcomed by the

Plaintiff, Mrs. Allen.   Mrs. Allen never indicated in any way whatsoever that she

welcomed the Harasser's speech or conduct.

151.   The Harasser's speech and conduct was sufficiently offensive to create an

environment that would be viewed by the reasonable person as hostile or abusive.

152.    At all times Mrs. Allen considered the Harasser's unwelcomed speech and conduct highly offensive.  Because of the Harasser's highly offensive, unwelcome speech and conduct, Mrs. Allen suffered emotional distress, embarrassment, humiliation, mental anguish, loss of enjoyment of life, depression, anxiety, severe stress, and loss of sleep. This led Mrs. Allen's performance at work to suffer.

153.    Because of Mrs. Allen's gender (female) and race (white) she would not have suffered the abuse and hostility at the hands of the Harasser.   The Harasser persistently and consistently engaged in a highly offensive, unwelcomed speech and conduct either directed at Mrs. Allen or in the presence of Mrs. Allen because she was female and white.

154.    Mrs. Allen repeatedly complained to her direct and immediate supervisors.

155.    Defendant Maryland Live! did not act reasonably in preventing and/or correcting acts of sexual and racial harassment.  The Company's anti-harassment policy was not followed in this case.  Instead, management overrode the written anti-harassment policy and implemented a new one when it came to customers harassing employees.  The new policy, communicated orally at shift meetings, provided that "players get what they want," and an employee's only redress was to "put a note in the player's file," and that getting regularly sexually and racially harassed at work by the same person was just "part of the job!"  Mr. Brewster's statements to Mrs. Allen served to override the Company's sexual harassment policy concerning how to handle concerns about possible discrimination or harassment.

156.   The Plaintiff, Mrs. Allen, acted reasonably by going to Mr. Brewster and Ms. Yeager first with her complaints because the written sexual harassment policy called for harassment victims to report instances of harassment to their immediate supervisor. Further, Mrs. Allen was reasonable in planning to escalate her concerns to the Human Resources Department.

157.   Mrs. Allen was terminated as a result of her threatening to report her complaints to the Human Resources Department.

158.   Mr. Allen was subsequently barred from opposing or investigating Mrs. Allen's discriminatory and/or retaliatory suspension and subsequent discharge from employment.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e *et seq*.

159.   Plaintiffs reallege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

160.   Through Defendant's actions, Defendant retaliated against Mrs. Allen in violation of Title VII by terminating her employment when she notified her immediate supervisors that she was going to escalate her complaints of sexual and racial harassment to the Human Resources Department.  Before she went to complain, her immediate supervisor conducted a sham investigation and ordered the Human Resources Department to terminate her employment.  Mrs. Allen's employment was terminated because of her opposition to Maryland Live! Casino's unlawful employment practices.

161. Mr. Allen's employment was terminated as a further act of retaliation against Mrs. Allen.  But for Mrs. Allen engaging in protected activity under title VII, Mr. Allen's employment would not have been terminated.

162.  Alternatively, Mr. Allen's employment was terminated because he openly opposed Mrs. Allen's discriminatory and retaliatory termination.  Mr. Allen's opposition to Mrs. Allen's termination was protected activity under Title VII.  But for Mr. Allen's opposition to Mrs. Allen's suspension and termination, his employment would not have been terminated.

163.  Alternatively, Mr. Allen was terminated for his lawful and rightful efforts to gather facts and information in support of his wife's EEO complaint.  These efforts in support of Mrs. Allen's EEO complaint are protected under Title VII.  But for Mr. Allen's protected activity in gathering facts and information in support of Mrs. Allen's EEO complaint, his employment would not have been terminated.

164. Mr. Allen's rights under Title VII were further violated when he was instructed not to oppose, react, or otherwise protest his wife's discriminatory and retaliatory termination or face an adverse employment action.

165.  The effect of the practices complained of in this Complaint have been to deprive the Plaintiffs', Mr., and Mrs. Allen of employment because they engaged in activity protected under Title VII.

166.  The unlawful employment practices complained of in this Complaint were intentional.

167.  The unlawful employment practice complained of in this Complaint were done with malice or with reckless indifference to the Plaintiffs' federally protected rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Mr. and Mrs. Allen respectfully request the following relief:

A. A declaratory judgment that Defendant has discriminated against Plaintiffs in violation of Title VII;

B.  A declaratory judgment that Defendant has retaliated against Plaintiffs in violation of Title VII;

B. A permanent injunction enjoining Defendant and its agents, employees and/or representatives from engaging in any further acts of discrimination or retaliation as set forth above;

C. An Order requiring Defendant to initiate and implement programs that will remedy the effects of Defendant's past and present acts of discrimination and retaliation;

D. An Order requiring Defendant to initiate and implement systems to ensure that individuals who engage in protected activity pursuant to Title VII or any other anti-discrimination law are treated in a non-retaliatory manner;

E. An award of back pay, lost benefits, and other damages for lost compensation and job benefits suffered by Plaintiffs in an amount to be determined at trial;

F.  An award for any actual monetary losses sustained by Plaintiffs as a direct result of Defendant's Title VII violations;

G. An award of compensatory damages to Plaintiffs in an amount to be determined at trial;

H.  An award of punitive damages to Plaintiffs for Defendant's malicious and reckless conduct described herein in an amount to be determined at trial; and

I.  Any other equitable relief to which Plaintiffs are entitled, including, but not limited to, expungement of any negative information contained in their personnel file;

J. An award of litigation costs and expenses, including reasonable attorneys' fees to Plaintiffs;

K. Pre-judgment and post-judgment interest; and

L. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

Respectfully submitted,

/s/

_____
David Manuel Baña (Bar No. 21292)
Law Office of David Baña, Esquire
129 Slade Ave
Pikesville, MD  21208
Tel.: (443) 742-2390
Fax: (410) 670-7573
E-mail: david@davidbana.com

34

*Attorney for Plaintiffs Christopher Allen and Nicole Allen*

Dated:  November 11, 2020